## Case No. 17,954.

### WOOD v. MANN et al.

[3 Sumn. 318.] [1]

Circuit Court, D. Massachusetts. May Term, 1838.

SALE UNDER EQUITY DECREE — ENFORCEMENT AGAINST PURCHASER—ATTACHMENT—INTEREST.

1. Under a decretal order of the court, certain lands were sold by the master. and the purchaser, in conformity with a further decretal order, gave security to the master, in the shape of a covenant, with a surety, to pay the purchase-money within fifteen days. The money was not paid. by either the principal or surety, within the appointed time. Held, that, on occasion of this default, a remedy at common law would be inadequate; that no proper damages could be given at common law upon a covenant taken by a court of equity to enforce its own decretal orders; that a court of common law could not entertain a suit upon such a security; that whoever makes himself a party to the proceedings of a court of equity, and undertakes to do a particular act under its decretal orders, may be compelled to perform what he has undertaken; that a court of equity may, by attachment, compel a purchaser at a sale by the master. to complete his purchase. by paying in the purchase-money: and that, a surety, who has made himself a party to the proceedings, as in the present case, is in the same predicament with the purchaser, and may be proceeded against by attachment. And it will make no difference. that the surety was not aware, that, in becoming so, he subjected himself to the summary process of the court; nor that the plaintiff had a right, on the-

1 [Reported by Charles Sumner, Esq.]

default, to resell the lands; nor can the surety take any exception to the title, if the purchaser, his principal, has failed to do so.

[Cited in The Kate Williams, Case No. 7,623; American Ass'n v. Hurst, 7 C. C. A. 598, 59 Fed. 3.]

[Cited in Rout v. King, 103 Ind. 557, 3 N. E. 250; Warfield v. Dorsey, 39 Md. 304; Townshend v. Simon, 38 N. J. Law, 241; Atkinson v. Richardson, 18 Wis. 246.]

2. A purchaser under a master's sale will not be let off from his purchase by a submission to a forfeiture of his deposit.

3. What circumstances amount to a waiver by the purchaser of a reference of the title to a master.

4. Under the circumstances of the case, and in pursuance of a decretal order, the defendant was charged with interest up to the time of the final payment of the purchase-money; although, under the circumstances, the purchaser and surety were not charged with interest, after their default.

5. The principal and surety have no claim upon the rents and profits of the estate, except from the time when the conveyance to them is completed.

[This was a bill in equity by Josiah Wood, Jr., against Samuel H. Mann, John R. Adams, and others.]

In this case, which had been several times before the court [Cases Nos. 17,951, 17,952, and 17,953], a sale of certain real estate, mentioned in the bill and proceedings, having been made by the master, pursuant to a decretal order of the court, the biddings were ordered by the court to be re-opened, by a decretal order of the 9th of December, 1837; and, in pursuance of the same order, another sale was had before the master, on the 20th of December, 1837, at which sale Simon C. Hewett became the purchaser of certain parcels of the land; and Valentine O. B. Brown became the purchaser of certain other parcels; of which sale and purchases the master made due report to the court, on the 23d of December, 1837. Among the conditions of sale, it was provided, that the purchase-money should be paid in gold or silver coin and the currency of the United States; that the purchaser should pay down, or secure, five per cent. of his purchase in cash, and the remainder on receiving his deed from the master; and should sign an acknowledgment of his purchase at the time of the sale. If the purchaser should neglect, or fail, to comply with the conditions of his sale, his deposit, and all his interest and claim in the premises, struck off to him, should be forfeited, and the lot or parcel be again put up for sale; a conveyance to the purchaser was to be made as soon as might be after the confirmation of the master's report of the sale. On the same day, on which the report of the master was filed (the 23d of December, 1837), Simon C. Hewett filed a petition in court, praying for a confirmation of the sales made to him; and Valentine O. B. Brown, at the same time, prayed a confirmation of the sales made to him. On the same 23d of December, 1837, the court passed a decretal order, confirming the sales, unless cause was shown to the contrary, on or before the 27th of the same

month. No cause was shown, or objection made. The plaintiff was to be at liberty to apply for a resale, if the purchasers did not pay the purchase-money, and complete the contract.

On the 30th of December, 1837, the master filed a supplementary report, stating that he had prepared proper deeds of conveyance of the land purchased by Simon C. Hewett, and Valentine O. B. Brown, ready to be delivered to them, upon the payment of the purchase-money. On the same day (the 30th of December, 1837) Valentine O. B. Brown filed a petition, referring to the preceding facts, praying that time might be allowed for preparation of a suitable deed from the master, and the payment of the purchase-money into court, as to the court might seem reasonable; and also stating, that he (Brown) had assumed the purchases made by Hewett, and that he was responsible for the same, and praying for a reasonable time to raise the money therefor. On the same day a decretal order was passed by the court, stating, among other things, the sales and proceedings and petition of Brown, and also, that Brown had given security for the payment of the purchase-money of the lands sold to Hewett within fifteen days; and that Hewett consented to the substitution of Brown as purchaser, as aforesaid; and thereupon it was ordered by the court, that the reports of the master stand confirmed; that Brown be substituted as the purchaser instead of Hewett; that Brown pay to the master the amount of the purchase-money within fifteen days from that day; and the master, upon the payment, should execute a due conveyance to him of the premises; that, if Brown should fail to pay the purchase-money, as above ordered, then it should be at the election of the defendant (Adams), within five days, to pay the amount, and to have a conveyance of the premises to himself; if neither Brown nor Adams should pay the purchase-money, then the premises to be again set up for sale, under the direction of the master. All the parties assented to this order. Owing to the extreme pressure of the times, the money was not paid within the fifteen days; the master then proceeded to advertise a resale of the premises. The proceedings upon the proposed sale were, however, stopped, upon an intimation from the court to the master, made with the assent of the plaintiff and the defendant (Adams). On the 27th of March, 1838, the defendant (Adams), with the assent of the plaintiff, filed a petition, which, after stating the proceedings, and that the security given to the master was a covenant by V. O. B. Brown with Ebenezer T. Andrews as surety, to pay the purchase-money within the fifteen days, and that the money had not been paid, as by a report of the master, therewith exhibited, appeared; and also, that a resale, from the embarrassments of the times, would be greatly to the prejudice of the petitioner, prayed, that the order for a resale should be rescinded, and also, that the said Brown and Andrews should

be cited to appear and show cause, why they should not pay the money, and why process of contempt should not issue against them upon their failure so to do, and for other relief. An order was accordingly passed by the court, suspending the proceedings for a resale, and directing cause to be shown by Brown and Andrews at the rules, on the first Monday of May, 1838, why the prayer of the petition should not be granted Process was duly served on Brown and Andrews; and the cause was further proceeded in at the May term of the court, 1838, when Andrews appeared and showed cause; but Brown made no appearance, and showed no cause against the petitions. The substance of Andrews's affidavit was, that he was a mere surety, without any interest or security; that he never supposed, that by giving such covenant he should become amenable to any summary process of the court, to comply with the terms thereof; that, by the conditions of sale, the premises were to be put up again, if the conditions were not complied with; that, by the decretal order of the 30th of December, a resale was directed, if the purchase-money was not paid; that proceedings towards a resale had been had, but Brown had been taken sick soon after giving the obligation, and ever since confined to his house, and unable to attend to business, and still was sick, and has been unable to raise the money; that he (Andrews) ought not to be called on, and is not liable to pay the money, by reason of his being surety as aforesaid; that he is unacquainted with the title to the premises, and does not know who is legally competent to convey the same; that the master has never reported, that a good title can be made; that Brown has never been ordered by the court to pay the money; that no decree has been made, that he shall complete the purchase; that, upon the opening of the biddings, the sales were enhanced in price from $11,481.88 to $15,975; that the deposit money paid by Brown is a sufficient security; and then submits it to the court, whether he ought to be compelled as surety to pay the purchase-money; whether Brown should not first be decreed to complete the purchase, etc.; and, finally, that Adams has no right to insist on this proceeding.

The covenant delivered to the master, is as follows: "Know all men by these presents, that, whereas, Simon C. Hewett, at a sale of lands in Lowell, on the 20th of December, instant, by George S. Hillard, Esq., master in chancery, was the highest bidder, and did purchase some of the lands then sold by said master, by the order of the circuit court of the United States for the First circuit, and whereas, Valentine O. B. Brown has assumed the purchases made by said Hewett, amounting in all to about eleven thousand dollars: Now, I, the said Valentine O. B. Brown, as principal, and I, Ebenezer T. Andrews, of Boston, as surety, do covenant and agree with Josiah Wood, Jr., who is the person for whose benefit said lands were sold, that the said lands purchased by said Hewett and assumed by said Brown, as aforesaid, shall be paid for in fifteen days from this date, agreeably to the conditions and provisions of said sale; and we will pay the same to said master within that time. In testimony whereof, we have hereunto set our hands and seals, this thirtieth day of December, A. D. 1837. In presence of," etc.

The master, on the 29th of March, 1838, reported to the court, that the purchase-money had not been paid; that he had prepared the deeds ready for delivery on the payment of the purchase-money; and that he had demanded payment under the consent both of Brown and Andrews, who declined to pay the same. And he has since returned the bond into court, stating it to have been executed in open court.

F. Dexter, for Adams.
B. Rand, for Wood.
Mr. Sprague, for respondent Andrews.

STORY, Circuit Justice. The proceedings in this case have been somewhat irregularly conducted; but the substantial merits cannot be open to much controversy. The decretal order of the 30th December, 1837, was expressly passed upon the footing of this very security or covenant given by Brown and Andrews for the payment of the purchase-money in fifteen days, the parties being present in the court and offering the security, as the foundation of the decretal order, to be passed upon the petition of Brown for further time to complete his purchase and pay the purchase-money. Now, stripped of all artificial forms and technical reasoning, what is the substance of the argument urged on behalf of the respondent Andrews? The money has not been paid according to the covenant, either by the principal, or by the surety; and although the covenant has been thus violated, the instrument itself, though in form a security to the court, through the master, for the due payment of the money to the master, is in reality no security at all to be enforced by the court. The appropriate remedy is merely a resale of the property, provided for in that decretal order; or, possibly, and at most, a remedy at the common law for damages upon the covenant. Now, if this be the true posture of the case before the court, it is one of a very extraordinary nature. Brown asked of the court an indulgence of fifteen days to pay the purchase-money into the court, giving security for the due payment at that time; and yet the security is no security at all for the due fulfilment of his undertaking to the court; but a resale is the true and proper security. Under such circumstances of what possible use could be the covenant with a surety; since the resale could be as well made without it as with it?

But then it is said, that a suit would or might lie at the common law for damages

on the covenant. Suppose it would, is it not plain that that would afford no adequate redress. A specific performance of the contract, and a completion of the purchase are what is required, and not damages possible or positive for the non-performance of it. The remedy at the common law would be utterly inadequate; and the proper suit, if any, would be a bill in equity for a specific performance of the very covenant. If such relief could be granted upon an original bill, framed for such a purpose, I should be glad to know why it may not be given in the present suit, to which the purchase is a mere incident, as the propriety of the relief must depend upon the very same facts now before the court, and upon none others. But what damages could be given by a court of common law in a case of this sort, upon a covenant or security given to or taken by the direction of a court of equity to enforce its own decretal orders? Did any one ever hear of such a suit upon such a security? What damages could be given? What means could a court of common law have to ascertain or measure the extent or nature of the damage? How could it know, what would be held to be the nature, operation, and extent, of such a security in the view of a court of equity? or what other means a court of equity might adopt to enforce it, or to redress the injury done by it, either by a re-sale or otherwise of the premises? Until the final action of a court of equity in its own modes of redress, or other exercise of jurisdiction, it would be utterly impossible for a court of common law to possess any adequate measure of damages; or to ascertain whether there were any damages at all. And even then, it could arrive at the result only upon a review of the whole proceedings in equity, which, if it were competent in point of jurisdiction to re-examine, it is not too much to say, that it would be a task of great embarrassment, and critical peril. The truth is, and I have no doubt, that a court of common law would so hold, that it has not any proper jurisdiction to entertain any suit upon a security of this sort given in the course of a proceeding in another court of justice. It might just as well undertake to enforce a stipulation taken in the admiralty, or a written acknowledgment of the purchaser at a sale before a master, or an undertaking of a party to pay money into court upon a special order. In my opinion there is and can be no effectual remedy administered in the present case, unless it can be by this court as a court of equity.

But it is said, that the present application is not made in behalf of the plaintiff, who had the conduct of the sale; but of the defendant (Adams), whose property has been subjected to the sale; and that it is not competent for Adams to ask the court to enforce an order of this court. It is unnecessary to consider, whether there is any valid-

ity in this objection upon principle or not; for the plaintiff, Wood, has adopted the petition and application of Adams, and now strenuously seeks its due enforcement. The objection, then, degenerates into a pure question of form.

Then, what are the grounds of objection to the jurisdiction of the court? First, it is said that there is no case to be found, in which a proceeding has been had of this sort against a surety. But the jurisdiction of courts of equity does not depend upon the existence of a case, in which the particular exercise of it asked for can be shown; but upon general principles and analogies, applicable to the structure of the court. No doubt is now entertained, that a court of equity may, by attachment, compel a purchaser, at a sale by the master, to complete his purchase by paying in the purchase-money. It stands upon the plainest principles of the court, that he who makes himself a party to the proceedings of the court, and undertakes to do a particular act under the decretal orders of the court, may be compelled to perform what he has undertaken. It is a mere incident to the due exercise of the principal jurisdiction, and indispensable to the due enforcement of the orders of the court upon persons who have submitted themselves to its jurisdiction. A sale before the master might otherwise become a mere mockery, and give an entire immunity to purchasers, to speculate upon the chances of the sales. Yet this doctrine, now so well established, was quite novel, as an exercise of jurisdiction, as late as 1808, when it was recognized and acted upon by Lord Eldon, in Lansdowne v. Elderton, 14 Ves. 512, who at first doubted, whether there was any instance of committing a purchaser, and whether the court could go further than to discharge him from his purchase. His lordship, however, did not hesitate ultimately to act upon the jurisdiction, and said, that the principle required it equally in the case of a purchaser, who could not be permitted to baffle the court and disobey an order, more than any other person. And Sir Samuel Romilly, who argued in support of the motion, said, that there was no distinction between a purchaser and any other person not a party; and he put the case of tenants in common, ordered to attorn to a receiver. The notion, indeed, is utterly groundless, that no person, but a direct party to the suit can be made subject to the orders or process of the court.

Now, what substantial distinction can there be between the exercise of the jurisdiction over the purchaser himself, and that over the surety, who has equally undertaken, under the proceedings, to pay the purchase money to the court? Each is equally a principal as to the court, and each simultaneously and substantially incurs, as to the court, the same responsibility. Suppose, the surety alone had undertaken to the court, for

and in behalf of the purchaser, to pay the purchase-money; would he not have been liable to the same process of the court, as if he were the purchaser? Suppose, the purchase had been by an agent for the purchaser, and the agent had expressly undertaken to the court to pay the purchase-money and complete the purchase, could there be a doubt that the process of attachment would lie to compel him to the performance of his undertaking? The difficulty of the whole argument consists in treating the surety, as a stranger to the proceedings; whereas he is in fact a party to the proceedings under the sale, and has agreed to become so, as far as the payment of the purchase-money is concerned. It appears to me, that the predicament of a surety is not in the slightest degree distinguishable from that of a purchaser, or of any other person, who makes himself, by his own undertaking, a party to any of the proceedings of a court of equity. He thereby submits himself to the jurisdiction of the court by the necessary implications of law, whatever may be his own private notions on the subject, with which the court cannot intermeddle; and he becomes amenable, like any other party, to the process of the court, to compel the due performance of his own undertaking.

The case of Richardson v. Jones, 3 Gill & J. 164, has been cited as an authority against the exercise of the jurisdiction against a purchaser or his sureties, in a case like the present. To the principal points decided in that case I perceive no solid objection; and under similar circumstances I very much incline to think that this court ought to make the same decree as that given by the appellate court, dismissing the petition of Benjamin Richardson, and dismissing the appeal from the interlocutory order of the chancellor, directing a payment of the purchase-money into court, or to show cause to the contrary. The whole force of the argument addressed to us is founded upon doctrines supposed to be given upon points and principles confessedly not then in judgment. In that case the court admitted the authority of a court of equity to enforce the payment of the purchase-money by attachment, as against the purchaser himself. But the court thought, that where, according to the terms of the sale ordered by the court, the sale was not to be a cash sale; but a bond with sureties was to be taken by the trustee at the sale for the payment of the purchase-money at a future time, there, inasmuch as the sale on those terms was, when made and ratified by the court, upon giving the bond with sureties, for a complete execution of the whole order of the court, touching the sale, the remedy for the subsequent payment of the purchase-money, was, for the trustee, by a suit at law on the bond, and not by a summary process of the court. The court, on that occasion, said: "There must be a decree or order of ratification, amounting to a decree, for the payment of the purchase-money, as a foundation for an order to bring it into court. It is not merely on the ground that the purchase-money is remaining unpaid, that such an order is passed; but it is on the principle, that there is a decree for the payment of the purchase-money, and the purchaser, being in contempt, the order has for its object the enforcement of that decree. Where there is not such a decree, there can be no such order. And an order of ratification, sanctioning and confirming a contract of sale, by which bond and security is given for the payment of the purchase-money, cannot, we think, be construed to amount to a decree for the payment of it. Where the sale is a cash sale, the order of ratification is held to amount to a decree for payment, which must be enforced in chancery, there being no remedy at law. But where it is not a cash sale, and bond is given for the purchase-money, the order of ratification adopts the bond, which stands in the place of a decree for payment, to be enforced at law." Now, whether this reasoning be entirely satisfactory or not; or whether it does not proceed upon an assumption of the very matter in controversy, as to the jurisdiction, is a question, with which I do not intermeddle. Much of the reasoning for the proper solution of such a question might depend upon the terms of the sale and of the bond, and upon the intention to make it a sale on credit, trusting to the personal responsibility of the parties, and not to the powers of the court to enforce its own orders and jurisdiction as to the payment of the purchase-money. But, however this question may be, it is plain that the reasoning of the court proceeds upon grounds, which distinguish the case most essentially from that before this court. In the present case the sale was a cash sale, without the slightest intention of credit; and the bond was given, not as a substitution for the payment of the purchase-money in cash, but to secure it at the end of the fifteen days, asked, as a special indulgence from the court, by the purchaser. The very confirmation of the sale, and the very order to enlarge the time of the payment of the purchase-money for fifteen days, was upon the application of the purchaser himself, to save him from a forfeiture; and upon an express undertaking with his surety, that the money should then be paid. The court never intended to part with its own hold upon the purchase-money, or to discharge the purchaser from the due payment of it, according to the terms of purchase, but to take a security, as a double assurance, to make its authority effectual. If, indeed, the surety can now evade the process of the court, the whole proceeding will have been a mere mockery; and the order of the court granted under a delusion. What has such a case to do with circumstances, like those in Richardson v. Jones, 3 Gill & J. 164? Be-

sides, this latter case came before the court under very extraordinary circumstances of fraud and collusion, or at least of meditated misconduct. And the bond itself was sought to be enforced on one side by a party to that fraud, or misconduct, and on the other side to be escaped from by a participator in the same improper conduct. Such a case was well calculated, especially when an application was made for relief after the lapse and laches of ten years and more from the time of the sale, to meet with the pointed discouragement of the court. Here there is not the slightest pretence of any misconduct. The parties applying for the relief have acted with the greatest good faith—uberrimâ fide.

In the next place, it is said, that here the decretal order was, that in case of the non-payment of the money in the fifteen days, there should be a resale by the master. But this constitutes no ground upon which the purchaser or his surety can found any right to refuse the performance of their undertaking with the court. It is a mere order by anticipation of the ordinary authority of the court to direct a resale, which is exercisable in all cases where a purchaser is in default; and does not obtain a respite from the court. It is an order essentially for the benefit of the other parties, and not for the purchaser. The latter has no right to demand, or to enforce it. It is a mere auxiliary security belonging to the plaintiff, seeking the benefit of the sale. The court uses at liberty to rescind or suspend it at any time, as indeed has been done in the present case. If this had been an ordinary contract for a purchase, in which the seller had reserved a right to resell upon the failure of the purchaser to comply with the terms of the sale, such a reservation would not have justified the purchaser in insisting on a resale, or, upon his default, have set him adrift from his contract. That would be to give him an election to violate his own contract. The very point was decided by Lord Eldon in Seton v. Slade, 7 Ves. 265, 276, where the contract embraced such a provision; and his lordship said: "If you make out that he (the seller) would have been at liberty to resell, that does not make out, that he lets the other off." The question here is not, whether the plaintiff has not a right to resell; but whether the purchaser and his surety have a right to violate the very terms of their contract, and to refuse to pay the very purchase-money, which, by their undertaking to the court, they were bound to pay in the fifteen days.

Then, again, it is suggested, that, upon the original conditions of sale, the purchaser, upon non-compliance with the conditions, was to forfeit his deposit, and the property might be resold by the master. But this provision obviously applied only to the case of the purchaser, refusing to comply with the conditions at the time of the sale, by signing an acknowledgment, that he was purchaser,

etc.; upon which refusal the master was to be at liberty to put the same again up for sale, that is, at the same sale; and not at a resale under a new order of the court. At all events, Brown, by his subsequent application to the court to have his purchase confirmed, and time allowed for payment of the money, placed himself in an entirely new attitude before the court, and incurred other responsibilities. But if it were otherwise, it is by no means true, that a purchaser is to be let off from his purchase by a forfeiture, or submission to a forfeiture, of his deposit.

Then, again, it is said, that no inquiry has been had into the title, which is the common practice after a confirmation of the sale by the master. It is so. But then such an inquiry is not indispensable; it is merely for the benefit of the purchaser, that he may not be compelled to take a defective title. But, if the purchaser is satisfied, and makes no objection to the title, or waives the inquiry, it does not afterwards lie in his mouth to take any exception of this nature. And, a fortiori, his surety has no right to take any such exception; for he has nothing to do with the matter of the title. That is an affair wholly appertaining to the rights and duties of the principal. In the present case, Brown has never, even to this hour, asked any reference for inquiry into the title; neither has he shown any objection to it. And his petition to have the purchase confirmed to him, in lieu of Hewett, and his application for the indulgence of fifteen days to pay the purchase-money, without asking for any such inquiry into the title, is a complete waiver of it.[2]

Some suggestions also have been made in the affidavit of the surety, and also at the argument at the bar, that the surety was not aware, that, by his becoming so, he subjected himself to the summary power and process of the court. That is wholly immaterial. It was his duty to know, that, by becoming a surety for the due payment of the purchase-money under the proceedings of the court, he became liable to the fullest exercise of the jurisdiction of the court, founded upon those proceedings.

Upon the whole, my opinion is, that an order ought to pass, that the purchaser, and, upon his default, the surety do, within thirty days from the passing of this order, pay the amount of the purchase-money into court, and upon default of such payment, that an attachment do issue against them, and that they do stand committed until this order is performed. And in case the surety shall pay the money into court within the same period, then he shall be at liberty to have the aid of the court in prosecution of the said attachment against the principal to

---

[2] See, as to the practice in regard to a reference of the title, and compelling the payment of the purchase-money by the purchaser, Bennet's Proceedings in the Masters' Office, 167–170; 2 Smith, Ch. Prac. c. 19, pp. 182–193.

compel him, as primarily liable, to pay the same, with liberty also for the surety to apply for any further aid of the court within its competency, to assist his own rights in regard to his principal.

A further question was at a later day submitted to the court, to determine up to what time interest was to be calculated against the defendant, Adams. By the decretal order of the 29th of May, 1837, which was passed by the consent of all parties, it was ordered, that unless Adams should pay the $13,000, and interest thereon, on or before the 18th of October, then next, the premises should be sold to pay that sum, and additional interest upon the principal until payment thereof, and costs, &c. The sum not being paid, the premises were accordingly sold at public auction under the direction of the master; and afterwards, upon petition, the biddings were reopened, and another sale took place for a higher price, at which Brown became the purchaser; and upon his application for an enlargement of time to pay the purchase-money, Andrews became his surety for the payment thereof at the time prescribed by the court. The payment not having been complied with by Brown, the plaintiff, Wood, according to a reservation made in his favor, in the original decretal order opening the biddings, proceeded to advertise another sale of the premises. That sale, however, was stopped by the court upon the application of Adams, with the consent of the plaintiff; and payment of the purchase-money was enforced by a decretal order against Brown and his surety, Andrews, and the latter accordingly paid the amount under the decretal order on the 7th day of July, 1838. The court, upon hearing the matter as to passing the decretal order for the payment of the purchase-money, refused, under all the circumstances, to direct the payment of any interest by Brown and Andrews on account of their failure to comply with the terms of the order above mentioned for an enlargement of the time to pay the purchase-money. Adams now insisted that he ought not to be compelled to pay any interest upon the principal sum due under the decree of the 29th of May, 1837, after the time when Brown ought to have paid the purchase-money on the confirmation of the sale to him.

B. Rand, for plaintiff.
F. Dexter, for defendant Adams.

STORY, Circuit Justice. Unless something has occurred, which in equity and justice requires the court to alter the original order of the 29th of May, 1837, which was assented to by all the parties, there is no pretense to say, that Adams ought not to be decreed to pay interest according to the terms thereof, up to the time when the whole principal due to the plaintiff was paid. The plaintiff did not receive that sum until the 7th day of July, 1838; and he was in no default in not before receiving it. The opening of the biddings and resale to Brown were for the benefit of Adams, and the premises were actually sold at a much higher price. The subsequent stoppage of the resale, upon the default of Brown, was at the urgent petition of Adams himself; and the whole proceedings against Brown and Andrews, under which the payment of the purchase-money has been enforced, was at his instance, and for his benefit, and upon his own showing a great advantage to him; for the resale would have been at a great sacrifice. So that, whatever delay has intervened, has not been occasioned by any laches or delay on the part of the plaintiff; but has been for the benefit of Adams; and the whole proceedings against Brown and Andrews, prosecuted under his direction. It seems to me plain, therefore, under these circumstances, that the decretal order of the 29th of May, 1837, ought to be enforced against Adams, according to its terms; and that any alteration thereof would be inequitable and unjust to the plaintiff. I do, therefore, direct, that interest be calculated upon the principal sum of $13,000 against Adams up to the seventh day of July, 1838, when the purchase-money was paid.

It has been suggested, that Adams has been in the receipt of the rents and profits of the premises up to the time, when the conveyance was perfected to Andrews, at the time of his payment of the purchase money; and that, possibly, he may be compelled to account therefor to Brown and Andrews, or to the latter. But there is no pretense for that; for neither of them has any claim for such rents and profits, except from the time, when the conveyance to them was completed. If it had been intended by the court to give them or either of them the benefit thereof, they would have been decreed to pay interest on the purchase-money. It has also been suggested, that there has been about $3,000 in the master's hands, ever since January, 1838. But that sum was, in the first place, properly applicable to the costs and expenses of the sale, etc. And, at all events, as the plaintiff has never received any benefit therefrom, he is not to be prejudiced by the existence of a fund, over which he had no control. If Adams had desired any particular application to be made of that fund, consistently with the proper objects, for which it was retained, it was his duty to have made some motion to the court on the subject.

These are all the remarks, which occur to me to be necessary to make on the present occasion. And here, I trust, this tedious controversy is ended. "Sunt certi denique fines litium."