## JOHN M. JUDAH *v.* O. C. BROTHERS, JR.

1. TAX SALE. *Immediate payment of bid.* *Code* 1880, § 527.

     Section 527, code 1880, which provides that, if the purchaser at a tax sale shall not immediately pay his bid, the collector shall offer the land again, has regard to the interest of the state in securing its revenue, not that of the delinquent taxpayer; and, in so far as it requires the bid to be immediately paid, is directory. The word immediately in the statute is a relative term, and has reference to the course of business with reference to which it is used. Reasonable compliance with the spirit and purpose of the statute is all that is required.

2. SAME.  *Failure to immediately pay bid.  Case.*

  Accordingly, where a tax sale is advertised and announced to be for
  cash, and there is no agreement that it is to be made on credit, it
  is not rendered void merely because the collector, to suit his own
  convenience and that of the purchaser, did not collect the bid and
  execute the deed until three or four days after the sale.

FROM the chancery court of Clay county.

HON. BAXTER McFARLAND, Chancellor.

Bill by O. C. Brothers, Jr., against John M. Judah to con-
firm a tax title.  The land in question was sold on the seventh
day of March, 1892, for the taxes delinquent thereon for the
year 1891, and purchased by complainant.  This appeal pre-
sents but a single question, and the facts in reference to it are
stated in the opinion.  There was a decree for complainant,
and defendant appealed.

*Houston & Reynolds*, for appellant.

The tax sale was void, because not made for cash.  Code
1880, §§ 521, 527; Black on Tax Titles, §§ 108, 109, 156;
Blackwell on Tax Titles, §§ 514, 515.

Appellee seeks to avoid this requirement by contending there
was no agreement with the sheriff not to pay the taxes, and
cites Black on Tax Titles, § 109, and *Longfellow* v. *Quimby*,
29 Me., 196.  We have not access to this case or to the stat-
utes of Maine, but we are not prepared to accept it as law.
The statute provides that the purchaser shall immediately pay
his bid, and if he fails the tax collector must offer the land
again.  He cannot defer payment three or four days after the
sale, even though he may have an agreement with the tax col-
lector to that effect.  *Hays* v. *Hunt*, 85 N. C., 303; *Donnell*
v. *Bellas*, 10 Penn. St., 341; 34 *Ib.*, 157.  We admit that
the case of *Anderson* v. *Rider*, 46 Cal., 135, holds differently.
To uphold the title of the purchaser in this case is to give him
the benefit of a violation by himself of the statute.  The
statute was enacted to insure the prompt collection of the
revenue of the state.  This was the sole object of passing the

law authorizing the sale of land for taxes, which is said by many authorities to be a near approach to tyranny, and to give the purchaser additional time is to defeat the law. In case of an excess bid, the case would certainly arise where the owner of the land would be affected, since the excess could not be paid to him by the purchaser. If payment can be withheld three or four days, why not five or six months, or one or two years? Within what limits will the court fix the time which will defeat a purchaser?

*Critz & Beckett*, for appellee.

We admit the collector had no right to sell on credit, but the record conclusively shows that the sale was for cash. The tax deed is *prima facie* evidence that the sale was for cash. Code 1880, § 526. There is no proof to overcome this presumption. The testimony of the tax collector shows that the sale was for cash. The law does not contemplate that the amount of the bid shall be paid instantly, nor does it require the collector to stop at the end of each individual's purchase and collect the money thereon. If there should be a delay of an hour or two, a day or two or even a month or two, in the payment of the money, it would not vitiate the sale. In order to vitiate the sale, it must be shown that the sale was for credit and not for cash, or that there was an agreement between the tax collector and the purchaser that the latter must have time. Black on Tax Titles, § 244. The authorities cited by appellant have no application to the present system in Mississippi, under which a conveyance for taxes shall not be held invalid except upon proof that the land was not liable for taxes, or that the taxes for which it was sold had been paid before sale. Code 1880, § 525. Besides, § 8, art. 12, const. 1869, provides that courts shall apply the same liberal principle in tax titles as in sales under execution. It is well settled that a failure to pay cash at a sheriff's sale under execution will not avoid the sale. *Hand* v. *Grant*, 5 Smed. & M., 508; *Adams* v. *Griffin*, 3 *Ib.*, 556;

*Jones* v. *Grant*, 34 Miss., 592.   It would be a strange con-
struction to hold that, while the collector can bring suit and
collect the bid and force the purchaser to take the land, that,
if the payment is made without coercion, the deed is void.   If
there was no agreement to sell on credit, the fact that the col-
lector afterwards gave a deed on time does not affect the validity
of the sale.   In such case the collector becomes liable for the bid
upon his bond, and the same is treated as paid.   Blackwell on
Tax Titles, §§ 278, 280; *Longfellow* v. *Quimby*, 29 Me., 196.

   Argued orally by *E. Mayes* and *R. O. Reynolds*, for appel-
lant, and *J. A. P. Campbell*, *amicus curiæ*, *contra*.

   WOODS, J., delivered the opinion of the court.

   The evidence shows that the tax collector's advertisement of
the sale of all lands delinquent for taxes, including those in-
volved in the present controversy, advised the public at large
that the sale was to be made for cash, and that at the time of
the sale the announcement was made that the sale was for cash.
There was no agreement or understanding between the tax col-
lector and the appellee that any credit should be given the lat-
ter by the former.   In the language of the deposition of the
tax collector, the lands were ''sold for cash.''   The tax col-
lector, regarding the appellee as *good*, as he expresses his idea
of solvency and reliability, did not stop the sale generally
when the lands embraced in this suit were bid off by and
knocked down to the appellee and execute a conveyance and
collect the money on the instant, but, for his own convenience
as well as that of the appellee, waited until the sales had been
completed, when, three or four days after such completion of
his sales, he received from him the amount of his bid.   It fully
appears, further, that this was his custom in making tax sales
and collecting money from successful bidders.   This convey-
ance from the collector to the appellee was by the former filed
in the office of the chancery clerk before the middle of March,
1892, where it remained for more than twelve months, and

until the period for redemption had expired, when, on March 13, 1893, the same was duly recorded in the deed books of that office. In October, 1893, the appellee exhibited his bill in the chancery court of Clay county, and prayed confirmation of his tax title. The appellant answered, and, amongst many defenses pleaded in his answer, denied that appellee paid the tax collector the amount of his bid for these lands, or any other sum, in cash, on the day of the sale of the lands.

We shall confine this opinion to the consideration of the question thus presented, believing the other defenses made in appellant's answer without merit. Was, then, the sale void because the money was not paid, and the tax collector's deed not executed on the very day the sale was made? The true answer to this question will be found by some consideration of our scheme of revenue laws, and particularly by construing § 527, code of 1880 (§ 3819, code 1892), which is a part of our system for raising revenue, and on which appellant relies strongly. Our system of taxation, as found in our laws, has for its one object the raising of revenue for the support of the government. Year by year and step by step our legislation has steadily advanced along the line of upholding sales for taxes, and validating titles resting on such sales, with the object in view of inducing individual purchases at tax sales, in order to the fuller collection of revenue by preventing, so far as practicable, the state's becoming the buyer at such sales. And even in those instances in which the state is compelled to purchase for the lack of any other bidder, the purchase is made to raise revenue by selling again as speedily as an individual purchaser for its title can be found, after the expiration of the period for redemption allowed to the delinquent owner and taxpayer. Of course, due regard must be paid to the rights of the landowner. His land must be subject to taxation, it must be assessed according to law, and the owner must be in default in payment of the taxes due thereon, and these things must all concur before his lands can be lawfully sold. This is well settled in this state, but it is also settled

that the defaulter in payment of a legally imposed tax on his
land is entitled to no favor, and cannot be heard successfully
to complain of anything done, or omitted to be done, in the
collection of the state's revenues which does not injuriously
affect him or his essential rights.    All that pertains to fixing
the charge on his land, as well as the time and place of the sale
of it for nonpayment of taxes due on it, concern and affect him,
and he may justly and successfully complain of any material
disregard of law as to these matters.    But, with the person
who purchases at the sale, or with the precise day or hour when
the bid made at the sale is paid, he has slight or no direct
concern.    If the sale, made necessary by the neglect or refusal
of the delinquent taxpayer to discharge his duty to the state
by paying into the treasury his proportionate part of the reve-
nues required to carry on the government, is had at the proper
time and place, and in the proper manner, and the money bid
is seasonably paid to the appointed officer, and before he is re-
quired to file deeds to individual purchasers with the chancery
clerks, by the first day of the month next following such sales
and purchases, or to make settlements with the state for cash
received by him on account of such sales, how is the defaulter
interested in or affected by payment of a bid at the very instant
of the fall of the auctioneer's hammer ?    So far as he is con-
cerned, it does not matter whether the cash be paid on the spot,
or the next hour or the next week.

But it is urged upon us that § 527, code of 1880, declares
an inflexible and unambiguous rule, when it says: "If the pur-
chaser shall not immediately pay,  .  .  the collector shall
offer the land again," etc.    What is the end to be attained?
What the purpose to be subserved by this section?    Clearly,
not the preservation of the delinquent owner's title nor the
conservation of any interest of his.    We see here the ever-
present purpose of raising its revenues by the state by securing
a second bidder, who can and will pay his bid if the first bid-
der has neither the ability nor the will to pay the bid which he

has made.    The declaration, in effect, is, if the state can secure
a second bidder who will bid enough to make good the delin-
quency of the owner in nonpayment of his taxes, the first
bidder may be released from compliance with the contract
made by his bid ; but if no second bidder can be found, the
first bidder shall be compelled to pay his bid, and, that being
done, he shall have the title to land to which his bid entitles
him.    The object of the section is to make sure the getting of
the revenue by subjecting the property to taxation as swiftly
as may be done.    It makes the collector master of the situa-
tion by giving him some simple and elementary instructions
and directions for his guidance in the conduct of tax sales.    He
is informed that he may not accept every bid, and especially
when made by one known to him to be irresponsible and un-
trustworthy, and thereby delay the collections of the public
revenues ; but, if he demand payment on the spot and refusal
is met, he shall at once offer the lands again for sale to other
bidders.    If the first bidder is known to the collector to be
solvent and reliable, the sale of other lands need not be de-
layed by stopping to make and acknowledge and deliver a con-
veyance to this first bidder, and to receive the amount of his
bid ; but if the first bidder is of such capacity and character
as to make the collector unwilling to rely on him, then the col-
lector should stop the sale, demand the amount bid, and, on
default in payment, again offer the land.    The great object, the
sole object, is to get in the taxes due.    It is the interest of the
public alone that was consulted in enactment of this section,
and the delinquent owner has no sort of concern in it.    This
must be so, for, in a certain contingency, the title to the land
is to be put in the first bidder *nolens volens*.    To our mind,
moreover, it would seem illogical to hold void a sale which, in
a given contingency, it is contemplated shall put title in the first
bidder, as is provided in the last clause of this § 527.    What
possible object, furthermore, could be said to have been in
legislative contemplation in § 531, code of 1880, in which the

tax collector is given until April 1 following the sale begin-
ning the first Monday in March, in which to file deeds made to
individual purchasers at tax sales in the office of the chancery
clerk, if the money was to be paid and deeds executed *pari
passu* with the sales themselves. In this latter case, no delay
in filing the deeds until April 1 need have been afforded, for
at the close of each day's sales they would have been then per-
fectly ready for filing. Manifestly this delay of nearly a
month was wisely provided for, that ample time might be had
by the collector for executing, acknowledging and delivering
deeds, often very many in number, for receiving the money
from purchasers, and for accurately, deliberately and com-
pletely carrying to an orderly end the work imposed upon him.
If the money were paid on the instant of the fall of the ham-
mer, and a deed were also thereupon instantaneously to be
executed to the bidder, the delinquent owner would not be
affected thereby. He can only redeem from the chancery
clerk, and this he can do only after the filing of the deeds in
his office on April 1. Whether payment be made on the in-
stant or the next day or the next week, is wholly immaterial
to him who can only redeem after April 1. But while imma-
terial to the defaulting taxpayer, it is matter of great interest
to the state that lands of delinquents be sold, purchasers be
found, bids made good and the public revenues collected by
April 1. If this be done, the end of the law has been accom-
plished and the state fully satisfied. The word "immediately"
in the section is thought by counsel to demand payment of a
bid on the instant. This view is too literal. The word imme-
diately is a relative term, and has relation to the course of
business with reference to which it is used. When the connec-
tion in which and the object for which it. is used in the statute
under consideration are considered, we entertain no doubt as
to its being directory and not mandatory. It is designed for
the guidance of the collector, with a view to the end to be
accomplished, and when that has been done, the object of the

law has been met.   The section is intended to direct the collector as to the proper method of procedure in making sales by which the state's revenues would with almost absolute certainty be secured.   But absolute compliance with the strict letter of the section, or reasonable compliance with the spirit and purpose of the section, by which, in either case, the end sought is attained, will satisfy the law, and whether absolute compliance with the strict letter, or reasonable compliance with the spirit and purpose of the act be adopted by the officer, in no way affects the rights of the defaulting taxpayer.

If the foregoing views as to the proper construction of our statute seem to call for other support than the reasoning therein employed, such support is at hand and everywhere.   Says Cooley, Const. Lim., p. 92, in considering statutory rules for assessment and collection of taxes: "Those directions which are not of the essence of the thing to be done, but which are given with a view merely to the proper, orderly, and prompt conduct of the business, and by a failure to obey which the rights of those interested will not be prejudiced, are not commonly to be regarded as mandatory; and if the act is performed, but not in the time or in the precise mode indicated, it may still be sufficient, if that which is done accomplishes the substantial purpose of the statute."   Shaw, C. J., in delivering the opinion of the court in *Torrey* v. *Milbury*, 21 Pick., 67, said: "In considering the various statutes regulating the assessment of taxes, and the measures preliminary thereto, it is not always easy to distinguish which are conditions precedent to the legality and validity of the tax and which are directory merely, and do not constitute conditions.   One rule is very plain and well settled, that all those measures which are intended for the security of the citizen, for insuring an equality of taxation, and to enable every one to know, with reasonable certainty, for what polls and for what real and personal estate he is taxed, and for what all those who are liable with him are taxed, are conditions precedent, and, if they are not observed,

he is not legally taxed, and he may resist it in any of the modes
authorized by law for contesting the validity of the tax; but
many regulations are made by statute, designed for the infor-
mation of assessors and officers, and intended to promote
method, system and uniformity in the modes of proceeding,
the compliance or noncompliance with which does in no way
affect the rights of taxpaying citizens.    These may be con-
sidered directory.    Officers may be liable to legal animadver-
sion, perhaps to punishment, for not observing them; but yet
their observance is not a condition precedent to the validity of
the tax.''    Authorities to the same effect might be endlessly
multiplied.

It is earnestly insisted by counsel for appellant that the sale
of the lands in controversy by the collector to the appellee was
a credit and not a cash sale.    From the views already advanced
by us, it necessarily follows that we cannot adopt this conten-
tion of counsel.    The evidence makes it certain that there was
no agreement or understanding that the appellee should be
given credit.    On the contrary, the sale was announced to be
for cash, and so the appellee and the collector understood per-
fectly.    For his own convenience, in part, the collector did not
execute the deed and receive the money from the bidder for
three or four days after the day of sale.    But this did not make
the sale one for credit.    As already declared by us, the statute
is directory, the state has secured the taxes due by the delin-
quent on these lands, and the purpose of the law has been ac-
complished.    No rights of the taxpayer were sacrificed and his
interests were not injuriously affected by the course pursued.
See *Longfellow* v. *Quimby*, 29 Me., 196; *Anderson* v. *Rider*,
46 Cal., 134; Blackwell on Tax Titles, 307; Black on Tax
Titles, §§ 108, 109.

On this point reliance is placed by counsel for appellant upon
the cases of *Hays* v. *Hunt*, 85 N. C., 303, and *Donnel* v. *Bal-
las*, 31 Penn. St., 157.    It is to be said, first, that the statutes
of both states on the subject of taxation, their general scheme

of revenue, are wholly unlike ours, and, in the second place, on their facts they are as far asunder as the poles from the case in hand. In the North Carolina case, the bidder at the tax sale only made good, or had made good, his bid, by paying the money two years and four months after the day of sale, and, even at that late day, only a part of the taxes due by the delinquent owner were paid to the sheriff. The conclusion arrived at in that case was the only one which could have been reached, but some of the observations indulged by the court before announcing its conclusion do not meet our approval. In the Pennsylvania case (first found in 10 Penn. St., 341, where the statutes of that state on this subject, and the facts of the case are more fully stated than in 31 Penn. St.), the bidder at the tax sale in June, 1824, took no steps to pay the amount of his bid until August, 1829, more than five years after the lands were knocked down to him on his bid. He never had conveyance to the lands, and, before his attempt in 1829 to acquire title by payment of his bid made more than five years before, the personal representative of deceased delinquent owner had paid to the proper officer the amount of taxes and costs due from the year 1815, and lifted the deed that had been made out, but not delivered, nor receipted on, to the bidder at the sale in 1824. On these facts but one conclusion was possible, and, in the opinion of the court in that case, it is plainly intimated that there had been "management and fraudulent perversion of the law" attempted to be practiced in this pretended purchase by the bidder at the tax sale.

The decree of the able and learned court below was correct, and it is accordingly

*Affirmed.*

Whitfield, J., dissenting.

The facts, so far as necessary to an understanding of the opinion, are as follows: The tax collector had, during seventeen years in which he had been sheriff, indulged the custom of never collecting the cash at a tax sale. In this instance he did

not collect it till "three or four days" after the tax sales were all concluded, as the record clearly shows. The tax collector testifies that he pursued this course because he had always had this custom, and because he regarded Mr. Brothers as perfectly good. He did not "offer the land" again, and the land was not struck off to the state. The single question, therefore, presented on this reargument is, whether the tax collector, not having "immediately" collected the bid from the first purchaser, nor until three or four days after all tax sales were over, and not having offered the land again, as the statute requires, and, hence, the state having had no land struck off to it, but having signed and acknowledged the deed the very day of the sale, the first purchaser is entitled to a tax deed—himself having procured, by failing to pay, the violation of the law. It is nowhere pretended, in the original argument or now, that the bid had to be collected the instant each separate sale was concluded, or on that day, if the sales lasted more than one day.

The unanimous opinion of this court heretofore delivered was in the following words: "The tax sales were completed on the seventh day of March. The deed was signed and acknowledged that day. It is clear that the money bid ($10.79) was not paid to the deputy making the sale, Jas. Cromwell, that day, and not, probably, for 'several days' after the sale. It was the custom of the sheriff, as to the payment of the bid, 'to wait the convenience of the parties, and himself to pay the purchase money;' he regarded 'Brothers as good pay,' and there was no 'reason why he should vary the general custom' as to Brothers. Section 521, code of 1880, is express and positive that the sale must be to 'the highest bidder, for cash.' Section 527 increases and emphasizes this explicitness by declaring: 'If the purchaser of land at tax sale shall not immediately pay the amount of his bid, the collector shall offer the land again, and if no person will then bid the amount of the taxes, it shall be struck off to the state as in other cases, but the first purchaser shall be liable for the amount of his bid,' etc.

The supreme court of North Carolina, in construing a statute strikingly like ours, says (*Hays* v. *Hunt*, 85 N. C., 303): 'Innocent purchasers are protected—that is, those who did not, and could not, because of their want of opportunity, know whether the prerequisites to the sale had been complied with or not. But when the violation of the law is known to the purchaser, and more especially when he has procured it, he will receive no protection from the law, and can take no benefit from his purchase. Such a person is not permitted to say that that which the law requires him to do is unimportant, in itself, and merely directory, but he must do all the law enjoins upon him, and do it in the manner and at the time prescribed; and doubly incumbent upon him is this duty, if prejudice to another can be the result of failure or delay on his part. An application of this principle to the case now under consideration seems fatal to the claim of the plaintiff. The direction of the statute to the plaintiff was plain and simple. As soon as declared to be the purchaser, as the latest and highest bidder, it was his duty immediately to pay the sheriff the amount of the taxes and costs then due, and to take from that officer, after its registration, a receipt for the amount paid. The object of this requirement was, manifestly, for the benefit and protection of the delinquent taxpayer. Extending to him the privilege of redeeming his land within twelve months next after the sale, the law intended that he should have the earliest possible notice, and at a place certain, of the sale, the name of the purchaser, and the amount necessary to be paid by him, in order that he might be restored to the complete ownership of his land. . . In such a case the sale is void, because the officer, clothed only with a naked power, has exceeded the terms of his delegated authority, and in doing so has been aided and abetted by the purchaser. As said by this court in the case of *Avery* v. *Rose*, 4 Dev., 549, there is no instance in which the law allows a person who is to do a thing, or to do it at a particular time, to have himself the benefit of it, when omitted, as if it were done, or done in due time, and certainly

not in a case where the delay is a prejudice to another, and the effect of the act, when completed, is to defeat a former estate. If the purchaser is not held to the time prescribed by the statute, then he has an indefinite period, and, as in this case, may postpone for over two years doing that which the law said should be done immediately.' If it be objected that the principles of this decision are not applicable here, because tax sales are required to be treated like sales under execution, the answer is twofold; first, that the principle that the purchaser who violates himself the law cannot take benefit by his own wrong, to the prejudice of another, is universal, and applies as well to tax sales as to execution sales; and, secondly, that this decision proceeds upon the ground of treating tax sales with the same liberal construction applied to execution sales. The court says: 'As the general rule, the power of the sheriff, being a naked power, uncoupled with any estate of his own, is strictly construed, so that he must conform in its execution to the terms of the statute which creates and confers it. But still, the main object of the law being to raise revenue for the state, the courts will not exact such a rigid observance of forms as will defeat such primary purpose, but will apply to sales for taxes the same reasonable rules of construction as govern sales under execution for private debts. With regard to sales of the latter sort, the rule has always been that, while a failure on the part of the officer to observe certain directions of the law would defeat any sale which he might make, there were still some other matters, apparently amounting to mandates, which might be omitted without being attended with consequences injurious to purchasers; and the true test in such cases is the knowledge which the purchaser has, or is presumed to have, because of his opportunities to know of the officer's default.' The principle is directly applicable, therefore. The same doctrine is laid down in the strongest terms in Black on Tax Titles, §§ 108, 109, the author adding to the reason given by Judge Ruffin, that when the sale is not for cash, part of the year allowed for redemption is

taken away from the owner, the further reason that, 'as a sale on credit would naturally enhance the price, it would be an injury to the owner of the land by compelling him to pay a greater sum for redemption than would otherwise be requisite for that purpose,'—a suggestion reinforced by the provision (§ 536, code of 1880) allowing ten per cent. interest per annum from the day of sale, under which, if a payment of the bid could be deferred (as urged by counsel for appellee) for 'two months,' the purchaser would, on the one hand, get the land, after knowingly violating the law, or, on the other, he would exact from the owner, in case of redemption, ten per cent. interest per annum on money whose use he had not parted with for a year. The statute is express and positive. It is idle to talk here of construction. 'If the purchaser shall not immediately pay his bid, the collector shall offer the land again, and if no person will then bid the amount,' etc., 'it shall be struck off to the state.' The provision is not merely that he shall pay 'immediately,' but that, if not paid 'immediately,' the collector shall 'sell again.' Sell when? Two days after the sale? Two weeks? Two months? Sell at any time after the tax sales shall have been concluded, and when purchasers are all gone? Is he to reassemble purchasers, readvertise and sell? The meaning and purpose are obvious. The purchaser shall pay 'immediately,' and, if he does not pay 'immediately,' he shall sell again, at that tax sale, before it is concluded and the sales over. Purchasers attending tax sales have in mind, from having seen the advertisement, what lands they wish to bid on. A, B and C wish to buy the same land. A bids, and the sheriff ('awaiting his convenience,' instead of executing the law), puts off payment, becomes insolvent, and cannot either pay or be made to pay. The other purchasers, B and C, who could have paid, if, upon A's 'not immediately paying his bid,' the 'collector had again offered' the land, have lost their opportunity to buy, and the state is delayed, if not defeated, in the collection of its revenue—certainly so as to the

purchaser knowingly violating the law. We do not say that
the collector shall stop after each sale. We pretermit that;
but we do think it is clear that, treating the sale days as one
day in law, certainly the purchaser must pay before such sale
day is past. Any other construction is manifestly violative of
the reason and purposes of the statute, and in the face of its
express and positive requirements. These views are supported
also by the following authorities: *Donnel* v. *Bellas*, 10 Pa. St.,
345; 34 *Ib.*, 159; Blackwell on Tax Titles (4th ed.), § 278; Black
on Tax Titles, §§ 108, 109, 156. The case of *Longfellow* v.
*Quimby*, 29 Me., 196, was a case where land was sold for taxes
assessed for road purposes, under a wholly dissimilar statute.
The action was trespass, and the defendant—not a party to the
sale by the treasurer to the plaintiff—sought to attack the sale,
which was made in pursuance of proceedings held to be judi-
cial, collaterally. The case has no application. *Anderson* v.
*Ryder*, 46 Cal., 137, was a tax sale, and the court in an illy-
considered opinion, *per curiam*, quote and follow the Maine case,
which is no authority for the proposition of the court. The
Maine case is sound law. The California case is unsound. All
matters connected with tax sales are very largely to be gov-
erned by the particular statute of each state. Black on Tax
Titles, § 156. Ours is even more peremptory than the North
Carolina statute. The authorities clearly support our view,
and none other can be consistent with the language of our
statute. The tax sale was, therefore, void.''

This opinion is put expressly upon the two grounds that in
North Carolina, as here, the courts are required to apply the same
liberal principles of construction to tax sales that are applied
to execution sales, and that, so applying the principles govern-
ing execution sales to tax sales, it is true of both that where
the sale is made in violation of the positive requirement of
statute law, and that violation is procured by the purchaser him-
self, brought about by the wrongful conduct of the purchaser
himself, the sale is void. These, distinctly and emphatically,

are the unassailable grounds upon which the opinion was predicated, and the reasoning of the supreme court of North Carolina, in *Hays* v. *Hunt*, 85 N. C., 303, is quoted at length, showing, beyond challenge, that the decision was rested on these grounds. *Hays* v. *Hunt* is squarely and exactly in point, and there is no answer to its reasoning, and it expressly held that the tax sale was void, because not made for cash. Indeed, learned counsel for appellee do not attempt an answer to it, but requote the Maine case, which the former opinion pronounced sound, but wholly inapplicable to the case at bar. Let us look at the North Carolina statute. The code of North Carolina (1883, vol. 2, § 3691), provides, touching tax sales of lands: "The sale shall be made at the courthouse of the county in which the land lies, . . and shall be conducted in all respects as sales under execution are." This is expressly recognized in *Hays* v. *Hunt* as requiring the same rule of construction for tax sales as for execution sales. Section 3696 of same code provides that the tax deed "shall be *prima facie* evidence that the sheriff or tax collector has complied with all the requirements of the law in making the sale for taxes." This is the counterpart of § 526, code of 1880. How, then, are sales under execution made? Code of 1880, § 1769, provides that "when lands" are sold under execution, "the officer making the sale, shall, on "payment of the purchase money, execute to the purchaser a conveyance." The statute of North Carolina is in the same words, substantially, as are, perhaps, statutes regulating execution sales generally. Indeed, learned counsel for appellee concede that both execution and tax sales must be for cash, but argue that, unless there is an agreement between the sheriff or tax collector and the purchaser that credit shall be extended, it is a cash sale, though the fact is no cash was paid. This is the doctrine of the California case (*Ryder* v. *Anderson*, 46 Cal., 135), repudiated in the former opinion, and all that is said by Blackwell on this subject (and other authorities) rests upon quotations from *Longfellow* v.

*Quimby*, 29 Me.—a case carefully examined when the original opinion was written, and shown therein to be inapplicable to the case at bar—the approval of the case by Blackwell, of course, being of the opinion as applied to the facts of that case.

The phrase, "a sale for cash," needs no construction—it means exactly what it says. The reasoning of the California court does not construe the phrase. It annuls it. Certainly, all will agree that the general rule is that execution sales must be for cash. This court says, in *Davis* v. *Pryor*, 6 Smed. & M., 119: "The statute makes it the duty of the sheriff, when lands are sold under execution by him, to execute to the purchaser necessary deeds of conveyance; . . but the law also annexes, as a condition precedent to the performance of this duty, the condition that the purchaser shall first make payment to the sheriff of the purchase money." In the *City of Atlanta* v. *Glover*, 61 Ga., 336, the court says: "Sheriffs' sales in Georgia are for cash. Any other rule would breed the utmost confusion and fraud in the enforcement of judgments. No agreement of the sheriff with the purchaser of property sold at sheriffs' sales, to dispense with the cash, can affect the rights of the plaintiff in *fi. fa.*, or other creditors of the defendant whose property is sold. . . Such an agreement is illegal and a nullity, and the sheriff may demand the purchase money at the time, and, upon the failure of the purchaser to comply with the terms of the sale, the sheriff may, at his option, proceed against the purchaser for the full amount of his bid, or resell the property, and proceed against the first purchaser for any deficiency. Sheriffs are mere ministerial officers, and have no authority to change the terms of their sales, which the law says shall be for cash." And the sale was held void, the cash not having been paid. To the same effect, and in language equally emphatic, are *Chapman* v. *Harwood*, 44 Am. Dec., 737; *People* v. *Kohler*, 5 Cal., p. 68; *People* v. *Hays*, 4 Cal., 127; *Wallace* v. *Nichols*, 56 Ala., 321; *Wakefield* v. *Fargo*, 90 N. Y., p. 213 (the court saying: "A sheriff,

in such case, must demand money, and if that is not paid he must then and there avoid the sale, and resell the property," etc.); *Wood* v. *Mann*, 3 Sumn., 318, Fed. Cas. No. 17,954, per Story, J.; *Ruckle* v. *Barbour*, 48 Ind., 274 (where it was held that, the purchaser not having been required to pay cash, and other parties having bought the equity of redemption in the property attempted to be sold, they had the right to pay off the judgment and take the property, as against the purchaser); *Holmes* v. *Richmond*, 19 Hun, 634 (where it was held that where there was a judgment against two defendants, and a sale, and the cash was not immediately paid—the purchaser saying "he was not ready to pay then, but would pay the bid in the morning, when the banks were opened, and the sheriff assenting," there being no agreement beforehand for credit—and one of the two defendants offered to pay the judgment next morning, before the purchaser came to pay, the sale was void, and the purchaser took nothing, there being less than a day's delay); and a multitude of other authorities, the last two cases illustrating very forcibly the absurd results to follow from the contrary holding. See, also, as strongly in point, *Remick* v. *Lang* (La.), 17 So. Rep., 461.

It is clear, then, that execution sales must be for cash, and that their being required to be for cash is not affected by the consideration that if the bid is not paid the sheriff must immediately resell, and can still hold the first purchaser on his bid. Then, as the general rule, tax sales must be for cash (Cooley, Taxation, 498), and for cash in the sense above laid down for execution sales. But the case here is stronger than the general rule, in the requisite that it must be for cash only. Section 527 mandatorily provides that, if the purchaser of land at a tax sale shall not immediately pay the amount of his bid, the tax collector shall offer the land again (then and there, manifestly), "and, if no person will then bid the amount of the taxes, it shall be struck off to the state as in other cases," etc. So § 521 provides that the land shall "be sold to the highest bid-

der for cash." Here, therefore, is, in the case of tax sales, a precise, positive, mandatory statute, declaring expressly that the cash must be "immediately" paid, or a resale then and there had. There is no such statute provision as to execution sales. The law, therefore, is far stricter in the exactness and emphasis of its command that a tax sale shall be for cash, than an execution sale. The steps are marked out with absolute exactitude. And there was the highest reason for the difference. The plaintiff in execution may wait as he may please, but the state cannot and will not wait for her revenues. They must, imperatively and exactly, be collected at the time fixed by law, or the whole machinery of government necessarily stops. It is, therefore, manifestly, quite aside from the mark to say that if the purchaser at execution sale does not pay cash immediately, but does pay before the return day of the execution, the sale is not void, but he gets the title. The answer is threefold, and perfect: First, the validity of the tax sale where the first purchaser does not pay his bid "immediately," and there is no second offer, and no striking off of the land to the state, is not left, like an execution sale where the first purchaser does not pay immediately, to the general principles of the common law, for the exigency and necessity for payment are wholly different in the two cases; second, § 1769 of the code of 1880 expressly permits the sheriff to make the deed to the purchaser at execution sale "on payment of the purchase money," not saying one word as to when the purchase money shall be paid, whereas § 527, in the plainest language possible to be used, expressly prohibits the tax collector from waiting, but peremptorily commands him, if the first purchaser shall not immediately (at some time, that is, during the tax sale) pay his bid, to "offer" the land "again," the statute law thus clearly, itself, marking out and signalizing the difference; and, third, the reasons for the difference in the imperativeness of the demand for immediate payment in the two cases are perfectly obvious. The analogy falls short, therefore,

of the common law, on the statute and on principle. Great
stress has been laid, in the reargument of this cause, upon the
supposed "dire results" sure to follow upon the establishment
of the rule announced that at some time during the tax sale
(not necessarily at the end of each separate sale) the cash must
be paid, and the great inconvenience, practically, that would
follow. The inconvenience is chiefly imaginary. It would
produce no more practical inconvenience than is occasioned in
the thousands of large auction sales daily occurring in the
cities, where the sheriff has deputies and clerks sufficient to col-
lect the cash as the sales proceed. And, if it did, inconvenience
is an argument for the legislature, not for a court. And so
far as the "disastrous consequences" conjured up, as probably
following in the wake of this rule are concerned, it must be too
clear for argument that the opposite rule is as certain to make
dire disaster possible as it is that night follows day. If cash
is not to be paid during the tax sale, pray when is it to be paid?
In five days? Ten? Twenty? By the first Monday in April?
In two months? A year? Two years? When? And where is
the law saying when? We are supposed to be living under law,
and the tax collector, it is presumed, must put his finger on
the law authorizing the delay. The only statutes are § 521
and § 527. Their language is too plain for construction. The
opposite view clearly warrants unlimited credit, and unlim-
ited credit means the absolute destruction of the revenues of
the state, chaos in the administration of government, and the
dissolution of all its departments, for the want of the taxes,
which are its only support. It is idle to say this could not
happen. It certainly might logically and legally happen, on
the opposite view, and if that view is thus destroyed by the
logic of its necessary results and the *reductio ad absurdum* to
which it is inescapably reduced, it merely illustrates, for the
millionth time, that courts should not abrogate by fanciful con-
struction the plan and unambiguous mandate of the law. We
have the right to run this construction into its practical appli-

cation, and test its soundness by the result. As well said by Sharkey, C. J., in *Hodge* v. *Wilson*, 12 Smed. & M., 498: "We are sometimes aided in the construction of a law, by running out its practical operation in a supposed case. If by doing so it becomes manifest that the intention of the legislature may be defeated, a construction which would produce that effect should not be adopted." And Mr. Justice Yerger, with equal emphasis, admonishes us, in *Thornton* v. *Boyd*, 25 Miss., 598, when the very argument pressed upon us in this case, by the learned *amicus curiæ* who addressed us in this case as to "sticking in the bark" as to a tax sale, was made there as to an execution sale where the return showed that the sale was made for $200, but failed merely to show that the purchase money had been paid: "If we once depart from the requirements of the law in any case," said that great judge, "we cannot see where we can fix the limit hereafter of the evidence which the court shall require that the purchase money has been paid." Wise words, fitting in here with special power. And surely, if this earnest appeal not to "stick in the bark" (though manifestly, in this case, it is not sticking in the letter, but enforcing the very spirit of the law) is effective to put title by tax sale in a purchaser who did not pay cash during the continuance of the tax sales, nor for some days afterwards, and who thus, having himself violated the law, ought not to complain when losing by reason of that violation of the law thus due to his own act, it ought also, most undoubtedly, to have been effective when made to this court by the owner, who not only had not violated any law, but had actually paid his taxes to the tax collector, against a tax deed made by the same tax collector, who had received his money, and yet sold his land, but who had not given the particular kind of receipt named in § 516, code 1880. It is perfectly manifest from other clauses of § 516 providing for the penalties denounced against the tax collector, as well as from the language "any other receipt," that the provision that no "other receipt

should be valid evidence'' meant valid in behalf of the tax
collector, and yet this court, in *Edmondson* v. *Ingram*, 68
Miss., 32, ''sticking,'' inexcusably ''in the bark,'' actually
held, on a bill filed by the owner to cancel the tax deed on the
ground that the taxes had actually been paid, that, because the
tax collector had failed in his duty in neglecting to give the
owner the proper receipt, such owner's estate was lost, and the
tax title good, though the taxes had actually been paid ! The
reason and the logic, if good for anything, must be good against
a tax title as well as in favor of it. And hence, if the pur-
pose of § 516, code 1880, was, in providing for the receipt,
''to cut up by the root litigation growing out of loose and
irregular or pretended payments of taxes by the citizen,''
and was applied when taxes had been paid even, with tenfold
more reason can it be urged that § 527 intended to ''cut up
by the root loose and irregular and pretended payments'' of
bids by tax title speculators. If the law is thus rigid as to
cash at an execution sale, *a fortiori* should it be, generally, as
to tax sales, and so it is here, specially, in § 527, an em-
inently just and safe statute. That the sheriff may resell,
both at execution and tax sales, takes nothing from this argu-
ment. ''If you make out'' (says Lord Eldon in *Seton* v.
*Slade*, 7 Ves., 265, 276), ''that the seller would have been at
liberty to resell, that does not make out that he lets the other
off.'' A singular illustration of the confusion to which the
view of appellee leads is furnished by the case of *Maina* v.
*Elliott*, 51 Cal., 8, where, six months being allowed for re-
demption from tax sale, and the cash not having been paid till
five months after sale, and a deed then made, and dated as of
the day of sale, the court held that the owner should have six
months from the day of payment in which to redeem. Cases
like this could be multiplied, warning, by their incongruous
results, of the peril of trifling with the plain and positive re-
quirements of the law. Mr. Sedgwick well says (Sedg., St. &
Const. Law, p. 262): ''The process, therefore, in these cases,

is not obedience to legislative commands; it is not an effort to arrive at the legislative intention; it is not construction of a doubtful provision; it is a violation of the words of a statute in order to make a rule according to the judicial notion of right. It is purely and strictly judicial legislation. ' *Divinatio est non interpretatio quae omnino recedit a litera.*' " See, also, generally, *Id.*, 325–327. Let it be further specially noted that the facts of this record, in the writer's opinion, show that there was an agreement between the tax collector and the appellee for credit, those facts being that it had been the well-known custom of the tax collector always not to collect the cash during the tax sales; that he waited on appellee because he deemed him "good;" that he signed and acknowledged the deed the very day of the sale, but waited the convenience of appellee for the money; that it is not the deputy who made the sale who testifies that it was, in his opinion, a cash sale, but the collector, who did not make the sale, and knew nothing about it. The deputy was not a witness. The appellee was, but never once said there was no agreement for credit. Whether there was such agreement was, in my view of our statute, immaterial, however.

Thus far the matter has been considered in the light of the duty of the tax collector to sell for cash only. But the case here is of a tax purchaser who has himself brought about the violation of the law, who not only knows the law, but procures its breach in his own interest. *Hays* v. *Hunt, supra,* shows clearly that such purchaser, whether a tax sale purchaser or an execution purchaser, can take nothing by his own wrong, and that such sale is void. So Judge Story says in *Wood* v. *Mann,* 3 Sumn., 318, Fed. Cas. No. 17,954, speaking of the claim of the purchaser that he should not be held, because the sheriff could resell: "That would be to give him an election to violate his own contract." It is this precise election which the view of the appellee would give the tax purchaser. If it suits him, he takes the estate "for a song;" if

it does not suit him, he lets it alone, and, if insolvent, goes free. The law never meant him to have any such "election to violate his own contract." But it is said the provision in § 527 that a suit by the state can be brought to recover the bid against the purchaser, and that, in case it be collected, the auditor is to make him a conveyance, shows that the sale is not void. It seems perfectly obvious that this is an entire misconception of the statute. What is meant, plainly, is that when no person shall have bought the land from the tax collector at the tax sale, and the land shall therefore have been "struck off to the state as in other cases," the state having thus become the owner by virtue of a sale conducted in conformity to the terms of the statute, it (the state) will, upon the collection of the bid, convey to the purchaser; otherwise not. The sale of the land made at the tax sale in that case is a sale to the state, not to a private purchaser. The sale thus made to the state was made in strict conformity to the statute after, and only after, the land had been offered without any persons bidding the "amount of the taxes;" and hence that sale to the state, thus made exactly as the law directed, was not void or voidable, but perfectly valid. Being valid, the state owns the land, and does, by the provision in question, direct its agent, the auditor, to convey its title, if the state collects the bid. The provision most manifestly provides merely a condition upon which the state shall convey its title, acquired at the tax sale, in strict compliance with the law; and the provision has no sort of application to a case like this, where a private purchaser bid, but did not pay cash, and no offer was ever afterwards made of the land, no sale was ever made to the state, and where there is not even a pretense of any sale whereat the land "was struck off to the state, as in other cases." Whoever heard of land being "struck off to the state, as in other cases," on facts showing an offer, a bid, no payment, and nothing else done whatever! The statute expressly says: "On the same being collected, the tax list shall be canceled as to that land," etc.—the tax list of

land struck off, as in other cases, to the state.  There is no pretense here that this land was ever "struck off to the state," and the provision so much relied on has no sort of application to the case in hand.  The fact that the first purchaser remains liable for his bid cuts no figure, for he is only so liable, clearly (at least to the state), when, he having failed to pay, and no other person having, on the next offer, bid the amount of the taxes, the "land" .has been "struck off to the state." That is the plain declaration of the statute.  The state has no interest to sue the first purchaser, who fails to pay his bid, if another purchaser, on the second offer, pays "the amount of the taxes."  That sum, "the amount of the taxes," is what it wants, precisely; no more, no less.  The statute is made to enforce, summarily and promptly, the collection of the public revenues, not to protect the owner in the collection of the different surplus coming to him from the difference between what the first and second purchaser may bid.  That difference, in such surplus, he doubtless has the right to sue the first purchaser for; but this statute does not provide for that remedy of his, but solely for the state's remedy to collect from the first purchaser when, and only when, no one having bid the amount of the taxes on the second offer, the land, thus unpaid for by any private purchaser, has been struck off to the state, and placed on its tax list of state lands.  This provision, therefore, is in aid, purely and only of the state's collection from the first purchaser of his bid, where, and only where, the land has been struck off to the state, in the absence of a sale to, and a collection of the "amount of the taxes from," some bidder on the same, at the sale.  It has no application, either, where some person bought and paid on the second offer (for then the state has got her taxes), nor where, the first purchaser having bid, but not paid during the tax sale, the tax collector—a "ministerial officer," acting only in virtue of the power conferred by the statute—has violated the statute, by failing to immediately collect the bid of the first purchaser, or, in de-

fault thereof, to "offer the land again." It is alone where there has been such second "offer," and a "striking off to the state" of the land in pursuance of such "offer," that the provision, intended alone for the benefit of the state, as to state lands, comes into play. When, therefore, it is asked, how can this sale be void when the statute provides that upon the collection of his bid, the auditor shall convey the state's title to the land, the answer is perfectly simple: The tax collector's sale, in virtue of which the first purchaser thus ultimately gets the state's title to the land, is not the tax collector's sale at which the land was struck off to him, but the tax collector's sale at which the tax collector, on his second offer, struck the land off to the state. That tax collector's sale was valid, because made in strict conformity with law, and, that sale being valid, the state got the land, and, having it, could convey it on the condition she prescribes in the last clause of the statute. What the first purchaser thus gets under this clause, is the state's title; what he would have gotten had he paid at that other, wholly distinct, tax collector's sale, at which the land was struck off to him, was the original owner's title. The construction I maintain secures irrevocably to the state, either "the amount of the taxes" from the first or some subsequent purchaser, or the land, which she may sell and get her taxes. The construction maintained by the appellee, robs the state not only of payment of "the amount of the taxes" by the first purchaser, either "immediately," or, if insolvent, ever, but also of the land which she could sell for her taxes. And, yet, this construction—wrong on the common law, wrong on the statute law, violative of principle, reversing the uniform public policy of the state, requiring, since statehood began, the prompt payment of her revenues—is to prevail, and in a court of conscience!

With all deference, the court seem to me to have abrogated the statute (§ 527, code 1880). The opinion states that: "We may see here the ever present purpose of raising its revenues

by the state, by securing a second bidder who can and will pay his bid if the first bidder has neither the ability nor the will to pay the bid which he has made." I quite concur that this is the "ever present purpose," and the construction I insist upon effectuates that purpose; but that "purpose" does not seem "ever present" with the majority of the court, who adopt a construction which, applied to the case in hand, "raises no revenues," but leaves the state without "the amount of the taxes," or the land from the sale of which to get that amount. The court, it seems to me, misconceive the case made by the record. Again, the opinion proceeds: "The declaration, in effect, is, if the state can secure a second bidder who will bid enough to make good the delinquency of the owner in nonpayment of his taxes, the first bidder may be released from compliance with the contract made by his bid." There is nothing in the statute to this effect. Obviously, it is a misconception if it is meant that the first purchaser is not liable on his "contract" to the owner for the difference in the surplus coming to him from the collector, arising from the difference in the amount of the bids of the first and second purchaser, in the case supposed. I presume it is meant that the first purchaser is released so far as the state is concerned. But the fact that he remains liable, as stated, to the original owner for the difference in the said surplus, in the case stated, as well as the further fact that when there is but one purchaser, and he does pay, but at some indefinitely "seasonable" time after the sales are all over, the tax collector keeps back from the owner the excess illegally, both demonstrate beyond answer, that such original owner does have a direct and most material interest in having the law enforced as written. Again, the opinion calls the tax collector "the master of the situation." What, exactly, is meant by this phrase, I do not know. I prefer to call the tax collector the servant "clothed with the naked power" conferred by the statute, and the statute itself the "master of the situation." The phrase sounds fine, and gives one a vague and mysterious

impression of omnipotence in the tax collector in dealing with the statute. But it seems unfortunate to me, in conveying the idea that somehow the tax collector is controlled only by his discretion in the sale, and not by the law, which is his and our "master." Again, the opinion announces that, if the first bidder be known to the tax collector to be "solvent and reliable," the "sale of other lands" need not be stopped for the execution of the deed and the collection of the money, etc. The statute does not provide any test of solvency, except the "immediate" payment of the bid, at some time before the tax sales are concluded. It does not say, if the first purchaser is "solvent and reliable," in the opinion of the tax collector, the tax collector need not make a second offer, etc. The opinion reads this into the statute. The statute does not substitute for "the amount of the taxes" then paid immediately, or the land struck off to the state if not, the precarious security of a tax collector's opinion as to the "solvency and reliability" of the thousand and one purchasers at tax sales, whose solvency may—

> "Like the borealis race,
> Flit ere you can point its place."

The "state's revenues" are "raised" on a sounder basis than that. Again, the opinion asks what possible object could there be in giving the tax collector till the first of April in which to file deeds to purchasers, if the money is to be paid and deeds to be executed *pari passu* with the sales, and declares that a month is allowed, "manifestly," "for executing the conveyances and receiving the money bid," etc. Two perfectly distinct things are here, and elsewhere throughout the opinion, as it seems to me, confounded. The statute requires the bid to be paid during the sales. It does not require the conveyances to individual purchasers to be executed immediately. There is no occasion for it, as these conveyances are to be filed with the chancery clerk, to remain during the period of redemption. There is urgent occasion for the immediate collection of the bids. The two things are wholly distinct, and

it is a mistake to thus confound them. Again, it is said that the word "immediately," in the section, "is thought by counsel to demand payment of a bid on the instant." I do not so understand counsel, but do understand them to contend, as was held in the original opinion, that the bid must be paid at some time during the continuance of the tax sales. Again, the opinion correctly states that, "for his own convenience, the collector did not receive the money from the bidder for three or four days," and yet the record shows that the deed was signed and acknowledged on the very day of the sale, March 7. Clearly, it ought not to have been executed till the money had been paid. Again, the opinion assures us that the statutes of "both states" (North Carolina and Pennsylvania) are "wholly unlike" ours, and the facts of the cases cited from these states "as far asunder as the poles" from the facts in this. On the contrary, as I have in detail shown, the North Carolina statute is practically identical with ours, and the statute of Pennsylvania, set out in the cases cited, strikingly like ours. Indeed, it is transparent that statutes in *pari materia* would generally, in all the states, be very similar. The object is everywhere the same—the prompt collection of the public revenue. And the facts here and in the cases from both states, so far as affecting the necessity for immediate cash payment—the only point under discussion—are entirely analogous. To hold, therefore, that this provision can be invoked to protect, not the state in her revenue, but the tax purchaser in his "election to violate his own contract," is one of the most marvelous of judicial anomalies. I had supposed, with Judge Sharkey (*Hodge* v. *Wilson*, 12 Smed. & M., 498), that "government was established for the benefit of the people," and that "it should not be permitted so to act by its officers as to produce injustice or oppression;" that it should "protect, and not sacrifice their rights." But if a tax collector can be permitted to indulge for seventeen years a custom of never collecting the cash at tax sales, and having a statute imperatively commanding him to

"immediately" collect it upon the first purchaser's bid being accepted, or, 'in default of payment, to "offer again" the land, construed as directory only, we are furnished with good reason to inquire if only those provisions of the statute are mandatory which "sacrifice" the rights of the owners of estates, and "protect" the sharks who ply their vocation of getting something for nothing at sales for taxes. We have certainly gone far, very far, in upholding tax titles. So far as that policy is wise, it should be steadily maintained. But, I am not aware that the "Mississippi system," as it is styled in the brief of learned counsel for appellee, is a system so peculiar in its wrongs, or so unique and bizarre in its methods, as to find itself without the support of reason or authority abroad, and hence driven to seek shelter in a name that means nothing. I take it, the system which extends over all citizens the equal protection of laws founded in justice and right, must be the only true "system," in "Mississippi" or elsewhere. Surely, we court no elevation to the "bad eminence" of having a tax system so abhorrent to justice and reason, the land over, as to find its only covert in our borders. If we must submit to the sacrifice of the original owners upon the altar of conscienceless speculators, ought it not to "give us pause" when, as here, we are asked to offer up on that altar the rights of the state herself to collect her revenues, and to exist as a sovereignty? I decline to participate in this sacrifice.

NOTE.—As indicated in the foregoing opinion, the decree in the case was at first reversed, Judge Whitfield delivering the opinion of the court, but, on reargument, an affirmance followed, whereupon the above dissenting opinion, embodying the original opinion, was delivered.—REPORTER.